# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into this 29th of August, 2008 (the "Effective Date"), by and between JOHN BEAN TECHNOLOGIES CORPORATION, a Delaware corporation with offices located at 200 East Randolph Drive, Chicago, Illinois 60601 ("Purchaser") and USA SALES & AUTOMATION, LLC, a Tennessee limited liability company, with offices located at 718 Airport Road, Gallatin, Tennessee 37066 ("Seller").

## WITNESSETH

WHEREAS, Seller in engaged in the business of designing, manufacturing, and selling equipment, parts, and services for the slicing of meat, seafood, poultry, bakery products and other food products.  Seller desires to sell and assign to Purchaser and Purchaser desires to purchase and acquire from Seller the Business, including substantially all of the assets relating to the Business, except those assets specifically excluded by the terms hereof, on the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth, and for good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## CERTAIN DEFINITIONS

SECTION 1.1. Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" means, with respect to a specified Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such specified Person.

"Business" means the business of Seller, including but not limited to all market share, financial, confidential and proprietary information, trade secrets, and intellectual property (in whatever form), as well as any finished goods which are sellable and not obsolete, and any other assets directly related to the business.

"Closing" has the meaning given in Section 2.5.

"Closing Date" has the meaning given in Section 2.9.

"Employees" has the meaning given in Section 3.13.

"Encumbrance" means any pledge, lien (including without limitation any Tax lien), collateral assignment, security interest, mortgage, deed of trust, title retention,

1



conditional sale or other security arrangement, or any license, order or charge, or any adverse claim of title, ownership or use, or agreement of any kind restricting transfer, or any other encumbrance whatsoever.

"Income Tax" (or "Income Taxes") means any federal, state, local, or foreign tax based on or measured by with reference to net income, including any interest, penalty, or addition thereto, whether disputed or not.

"Industrial Assets" has the meaning given in Section 2.1(c).

"Intangible Assets" has the meaning given in Section 2.1(b).

"Intellectual Property Rights" has the meaning given in Section 2.1(a).

"Inventory" has the meaning given in Section 2.1 (d).

"Liabilities" (or when used with reference to a single item described below, "Liability") means debts, commissions, duties, fees, salaries, performance or delivery penalties, product liabilities, warranty liabilities (whether implicit or explicit or whether granted orally or in writing) and obligations (whether pecuniary or not, including without limitation obligations to perform or forebear from performing acts or services), fines or penalties, whether accrued or fixed, absolute or contingent, matured or un-matured, determined or determinable, known or unknown, arising or existing anywhere in the world, including without limitation those arising under any law, action or governmental order, liabilities for Taxes and those arising under any contract, agreement, arrangement, commitment or undertaking of any kind whatsoever (whether written or oral, express or implied).

"Purchase Price" has the meaning given in Section 2.6(b).

"Person" means any natural person or legal entity, including without limitation a corporation, limited liability company, partnership, or a government or political subdivision or an agency or instrumentality thereof.

"Purchased Assets" has the meaning given in Section 2.1.

"Tax" (or "Taxes") means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not.

"Transaction Taxes" shall mean all Taxes (including without limitation any sales, use, excise, value added, registration, stamp, property, documentary, transfer or other Taxes) imposed by or payable to any jurisdiction or any governmental authority, incurred or payable by any Person (including without limitation Seller) with respect to the delivery or transfer of the Business or any of the Purchased Assets pursuant to this Agreement or the License Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF PURCHASED ASSETS

SECTION 2.1.  Assets to Be Sold and Purchased.  Subject to the terms and conditions of this Agreement, Seller shall, on the Closing Date, sell, assign, transfer, convey and deliver to Purchaser and on the Closing Date Purchaser shall purchase, acquire, assume and receive from Seller, all of Seller's right, title and interest in and to all of the Business assets (collectively the "Purchased Assets"), including, but not limited to:

(a)     Intellectual Property Rights.  Those patent rights, trademarks, trade names, service marks and copyrights, both registered and unregistered; all registrations and applications therefore; all inventions, associated know-how and trade secrets; engineering information lists, computer software, telephone, fax #'s, internet addresses, domain names, web sites and all goodwill associated therewith, to the extent owned or licensed by Seller and relating to the Business, including the intellectual property identified on Schedule 2.1(a).  This includes all rights to sue or make any claims for any past, present or future infringement, misappropriation or unauthorized use of any of the foregoing rights and the right to all income, royalties, damages and other payments that are now or may hereafter become due or payable with respect to any of the foregoing rights, including without limitation damages for past, present or future infringement, misappropriation or unauthorized use thereof (collectively, the "Intellectual Property Rights");

(b)     Intangible Assets.  All intangible assets, properties and rights owned or licensed by Seller, including records maintained in computer databases or files or on other magnetic media, including without limitation:  all software, technology, works of authorship, manuals, logbooks, notebooks, user's guides, programmers' notes, documentation, manufacturing rights, know-how, trade secrets and all associated information related to the Business (collectively, the "Intangible Assets," which includes but is not limited to those items identified in Schedule 2.1(b)), provided, however, that Purchaser shall allow Seller to retain a copy of such software program or documentation as is necessary to allow Seller to collect and pay Receivables and Payables (as defined below);

(c)     Industrial Assets.  All design plans, schematics, service records, customer lists, customer contact names, customer files, pricing and payment histories, supplier lists and pricing, distributors lists and pricing, any business planning documents including but not limited to market assessments, pricing analysis, sales and marketing

plans, business/product line presentations, any sales or services related materials including but not limited to sales and technical bulletins, marketing materials, bills of materials, drawings, blueprints, technical information, detail of works and process instructions, design and raw material specifications, manufacturing plans or instructions, parts lists, ideas, concepts, inventions, discoveries, processes, procedures, methodologies, know-how and other technologies related to the Business (collectively, the "Industrial Assets," which includes but is not limited to those items identified in Schedule 2.1(c)); and

(d)     Inventory.  All non-obsolete and saleable inventory (raw materials, work-in-process, finished goods and parts) intended for use or sold in the operation of the Business, in each case wherever located (the "Inventory").  The Inventory as of December 31, 2007 is listed in Schedule 2.1(d).  Treatment of Inventory and work in progress at the time of the Closing is set forth in Exhibit A.

(e)     Machinery, Equipment, and Other Assets.  All manufacturing machinery, tooling, forms and jigs used in the operation of the Business (the "Machinery").  All equipment and tangible personal property, including, without limitation, furniture, leasehold improvements, fittings, fixtures, workshop tooling, computer hardware, Construction In Process assets (the "Equipment"), and all other tangible assets and property used by Seller in the operation of the Business (the "Other Purchased Assets").  The Machinery, Equipment, and Other Purchased Assets include but are not limited to the items listed in Schedule 2.1(e).

(f)     Prepaid Expenses.   All deposits, refunds, rebates and tenant reimbursements, and prepaid expenses.

(g)     Assigned Claims.  All causes of action, claims and demands of Seller related to the Business, including, without limitation, rights or choses in action under express or implied warranties relating to the Purchased Assets ("Assigned Claims").

(h)     Customer Information.  All information of Seller regarding the customers of the  Business and all of Seller's sales records, including, without limitation, customer lists, supplier lists correspondence with customers, customer files and account histories (including, without limitation, receivable and collection history), sales literature and promotional material used in the operation of the Business, including records maintained in computer databases or files or on other magnetic media.

(i)     Books and Records.  All other books and records used exclusively in the operation of the Business, including records maintained in computer databases or files or on other magnetic media.

(j)     Various Intangibles.  The right to continue manufacturing, marketing, selling and leasing Products using Seller's current Product numbers and color schemes.

(k)     Warranties.  All rights under or pursuant to all warranties, representations and guarantees (including right to return inventory) in connection with the Business.

(l)     Permits.  All rights under or pursuant to all permits in connection with the Business.

SECTION 2.2  Excluded Assets.  The following assets shall not be transferred to Purchaser, but shall be retained by Seller (the "Excluded Assets"):

(a)     Nonassignable Contracts and Nonassignable Permits.  Without limiting the effect of Section 2.3, (i) any Nonassignable Contract or Nonassignable Permit with respect to which, but only so long as, the required consent, approval, novation or waiver of a third party necessary for the Transfer thereof has not been obtained, (ii) any nontransferable qualification or license to do business in any jurisdiction (domestic or foreign), and (iii) any other asset not material to the Business that cannot be Transferred to Purchaser and the benefits of which cannot otherwise be made available to or realized by Purchaser.

(b)     Receivables.  Those receivables arising out of the operation of the Business including accounts receivable, notes receivable, and sundry receivables and all amounts due thereunder from customers for products completed by Seller in the operation of the Business prior to the Closing Date (the "Receivables").  The Receivables as of July 31, 2008 are listed in Schedule 2.2.  Purchaser agrees that Seller shall be allowed to retain a copy of the software or records necessary to permit Seller to collect the Receivables after the Closing Date.

(c)     Company vehicles.  Those vehicles currently owned or leased by the Business for the benefit of the Business or the employees of the Business, which are listed in Schedule 2.2.

(d)     Certain Bank Accounts.  Seller's bank accounts related to the Business at Bank of America, account # 004443019764, and First Tennessee Bank, account # 101566570.

(e)     Petty Cash.  The petty cash related to the Business in Seller's possession as of the date of the Closing.

(f)     Seller's Defined Benefit/Retirement Plan.  Seller's existing defined benefit/retirement plan for its employees (the "Retirement Plan").

SECTION 2.3.  Nonassignable Contracts and Nonassignable Permits.

    (a)   Nonassignability.  Nothing in this Agreement will constitute a transfer or an attempted transfer of any contract or permit which is not capable of being transferred (including, without limitation, with respect to any software license as to which any required third party consent to transfer is not obtained) without the consent, approval, novation or waiver of a third party (including, without limitation, any nation or government, any state, province or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any governmental tribunal or arbitrator(s) of competent jurisdiction ("Governmental Authority"), or of any contract or permit the transfer or attempted transfer of which would constitute a breach of such contract or permit or a violation of any applicable domestic or foreign constitution, treaty, statute, law, ordinance, rule, regulation, permit, code, order, award or decree of any Governmental Authority ("Law") (collectively, the "Nonassignable Contracts" and the "Nonassignable Permits," respectively as set forth in Schedule 2.3).

    (b)   Seller To Use Commercially Reasonable Efforts.  Notwithstanding anything contained in this Agreement to the contrary, Seller will not be obligated to transfer to Purchaser any of its rights and obligations in and to any Nonassignable Contract or Nonassignable Permit without first having obtained all consents, approvals, novations and waivers necessary for such transfer.  Prior to the Closing and for a period of six (6) months thereafter, each of Seller and Purchaser will, and will cause its Affiliates to, use reasonable best efforts in obtaining all consent, approvals, novations and waivers necessary to transfer to Purchaser all Nonassignable Contracts and Nonassignable Permits; provided, however, that, in each such case, neither Purchaser nor Seller will be obligated to commence any litigation or offer or grant any accommodation (financial or otherwise) to any Person or incur any other obligation or liability therefore, and Purchaser and Seller shall each bear their own expenses in connection therewith.

    (c)   If Waivers or Consents are Not Obtained.  To the extent that Seller uses reasonable best efforts to obtain, but nevertheless fails to obtain, a consent, approval, novation or waiver referred to in paragraph (b) with respect to a Nonassignable Contract or Nonassignable Permit on or prior to the Closing Date, Seller will, at Purchaser's reasonable request, during the period commencing with the Closing Date and continuing until the earlier of (i) the expiration of the original term of the applicable Nonassignable Permit or (ii) Seller's receipt of written notice from Purchaser that Purchaser has obtained an adequate replacement for such Nonassignable Contract or Nonassignable Permit, cooperate, in any reasonable and lawful arrangements designed to provide Purchaser the benefits and risks of such Nonassignable Contract or Nonassignable Permit to the extent relating to the Business and Purchaser shall indemnify, defend and hold harmless Seller from any and all Losses (including, without limitation, any increase in the liability of Seller or any Affiliate thereof in respect of any taxes) arising out of such requested cooperation and arrangements; provided that, to the extent the parties are successful in

providing such remaining benefits, if any, of such Nonassignable Contract to Purchaser, Purchaser will pay, honor and discharge when due the corresponding liabilities, obligations and commitments of Seller arising thereunder with respect to periods after the Closing; and, provided further that, to the extent the parties are not successful in so providing such remaining benefits of any Nonassignable Contract to Purchaser, Purchaser will have no obligation to pay, honor and discharge when due the corresponding liabilities, obligations and commitments of Seller arising thereunder with respect to periods after the Closing.

SECTION 2.4.  Assumed Liabilities.  Except as set forth in Schedule 2.4, Purchaser is not assuming any liabilities or obligations of Seller, whether with respect to the Business or otherwise.  All such liabilities remain Seller's obligation only and are specifically excluded.

SECTION 2.5.  Closing.  Subject to the terms and conditions of this Agreement, the sale and purchase of the Purchased Assets, and all of the other closing deliveries required by Section 2.6, a closing shall take place at Seller's offices (the "Closing").  The date on which the Closing actually occurs shall be called the "Closing Date" as provided in Section 2.9.

SECTION 2.6.  Closing Deliveries.  At the Closing, each of the following parties shall deliver or cause to be delivered to the designated party or parties all of the following, and in the case of executed agreements, documents or instruments, in each case executed by a duly authorized representative of the party on such party's behalf;

(a) Seller shall deliver to Purchaser:

(i)  the Purchased Assets as follows:  (A) all software included in the Purchased Assets and all other Purchased Assets that can be delivered electronically without undue expense or expenditure of time will be delivered electronically to Purchaser, as Purchaser shall, at its option, designate; and (B) all Purchased Assets not delivered electronically will be delivered to Purchaser by delivery of possession thereof to Purchaser's representative at the Purchased Assets' current location(s) (or at different, mutually agreed location(s)) at Purchaser's cost and expense;

(ii) any and all of Seller's right, title and interest in and to any and all contracts, permits, registrations, agreements or other arrangements, written or oral, in connection with the Business, together with any contracts and agreements to which Seller is a party.  A list of all such contracts is provided as Schedule 2.6(a) (the "Contracts"). Schedule 2.6(a) shall be updated at the Closing; and

(iii) all other items required to be delivered pursuant to the provisions of this Agreement.

(b) Purchaser shall deliver to Seller the following, which shall be considered the total purchase price for the Purchased Assets (the "Purchase Price"):

    (i)    $4,440,557, as adjusted by:

    (ii)    the difference between the value of the Inventory, as determined in accordance with Exhibit A hereto, and the Inventory count dated as of December 31, 2007, which assigned the Inventory a value of $113,691; plus

    (iii)    any adjustments as per the calculations set forth in Exhibit A hereto (for settlement of in-process orders, commission on orders received prior to execution of the APA, and shipping/installation costs on complete orders).

SECTION 2.7.  <u>Allocation of Purchase Price</u>.  The Purchase Price shall be allocated among the Purchased Assets for tax purposes in accordance with an allocation to be agreed upon by Purchaser and Seller on or prior to the Closing Date.  The allocation shall be annexed hereto as <u>Schedule 2.7</u>.  Seller and Purchaser will follow and use such allocation in all tax returns, filings or other related reports made by either of them to any governmental agency.  To the extent that disclosures of this allocation are required to be made by the parties to the state or federal tax authorities under the relevant tax provisions or regulations, Purchaser and Seller will disclose such reports to one another prior to filing the same with the tax authorities.

SECTION 2.8.  <u>Inventory Count</u>.  Prior to or concurrent with the Closing Date and at a time that is mutually agreed upon by the parties, Seller and Purchaser shall conduct a physical count of the Inventory to be acquired by Purchaser at the Closing, and shall determine the value of the Inventory.  In advance of the physical count of the Inventory, Seller shall provide Purchaser with an Inventory list as of the date of the Inventory count, along with an aging report of the Inventory and the Inventory consumption history.  To the extent that there is any dispute regarding the value of the Inventory, it will be resolved prior to the Closing Date, with both parties acting reasonably and in good faith.  Each party shall be responsible for its own costs and expenses associated with the physical count of the Inventory; provided, however, if Purchaser deems it necessary to hire a third party to assist with said inventory, all costs associated with said third party shall be paid by the Purchaser.

SECTION 2.9.  <u>Closing Date</u>.  The Closing Date shall be September 4, 2008.

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Purchaser as follows:

SECTION 3.1.  Incorporation, Authority and Binding Obligation.  Seller is a limited liability company duly incorporated, validly existing and in good standing under the laws of the State of Tennessee and has all necessary corporate power and authority to enter into this Agreement, to carry out and perform its obligations hereunder and thereunder and to consummate all of the transactions contemplated hereby and thereby. This Agreement  has been or will be duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by each other party thereto) this Agreement  constitutes legal, valid and binding obligations of Seller enforceable against Seller in accordance with their terms, subject to applicable bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally, general equitable principles, the discretion of courts in granting equitable remedies, and matters of public policy.

SECTION 3.2.  No Conflict.  The execution, delivery and performance of this Agreement  by Seller does not and will not:  (a) conflict with or violate the certificate of incorporation or by-laws of Seller; (b) conflict with or violate any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award applicable to the Purchased Assets; (c) result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, or give to others any rights of termination, rescission, amendment, acceleration or cancellation of, any material note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument relating to any of the Purchased Assets to which Seller is a party or is bound or by which any of the Purchased Assets are bound or affected; or (d) result in the creation of any Encumbrance on any of the Purchased Assets.

SECTION 3.3.  Consents and Approvals.  Except as set forth in Schedule 2.3 and Schedule 3.3, the execution and delivery of this Agreement by Seller does not, and the performance of this Agreement by Seller will not, require any consent, approval, authorization or other action by, or filing with or notification to, any third party, including but not limited to any governmental or regulatory authority.

SECTION 3.4.  Title to and Condition of Purchased Assets.  Seller owns all the Purchased Assets and Intellectual Property Rights therein and Seller has good and marketable title in and to all the Purchased Assets, free and clear of all Encumbrances whatsoever.  Except as set forth in Schedule 2.6(a), none of the Purchased Assets is licensed from or to any third party.

SECTION 3.5.  Litigation.  Except as set forth in Schedule 3.5, to the Seller's knowledge, there is no claim, action, suit, investigation or proceeding of any nature pending or threatened, at law or in equity, by way of arbitration or before any court, governmental department, commission, board or agency related to the Business or the Purchased Assets.  There are no judgments, decrees, injunctions or orders of any court, governmental department, commission, agency, instrumentality or arbitrator pending or binding against Seller which affect the Purchased Assets.  Seller shall be responsible for, and shall defend and indemnify Purchaser for any action identified in Schedule 3.5, for

any and all actions brought against Seller between the Effective Date and the Closing, and for any actions arising out of or related to the conduct of the Business prior to the Closing Date.

SECTION 3.6.   Financial Statements.

(a) True and correct copies of the balance sheets, income statements and statements of cash flow for the periods ending December 31, 2005, 2006 and 2007, and for the period from January 1 to July 31, 2008 (the "Financial Statements") are set forth in Schedule 3.6.  Except as set forth therein, the Financial Statements were (i) prepared in strict accordance with commercially acceptable accounting standards and on a basis consistent with past practices, (ii) prepared from the books and records of the Business, and (iii) present fairly and accurately the financial position and results of operations of the Business as of the date thereof and for the period indicated.  Seller has not changed the accounting principles (including its reserve or accrual policies or amounts) it used in respect of the Business since its inception.

(b) Since July 31, 2008 the Business has been conducted in the ordinary course, consistent with past practices.

SECTION 3.7.   Intellectual Property.

(a) Those Intellectual Property Rights used or held for use in connection with and necessary for the conduct of the Business are owned by Seller and include those items identified in Schedule 2.1(a).  Schedule 2.1(a) sets forth (i) for each patent and registered design, the number, date of issuance, and subject matter for each country in which such patent or registered design has been issued, (ii) for each patent application and registered design application, the application number, date of filing and subject matter for each country in which such application has been filed, and (iii) for the registered trademark and trademark application, the trademark application serial number or the trademark registration number, the registration date or the filing date, the trademark class of goods covered and the trademark expiration date for each country in which a trademark has been registered or a trademark application has been filed.

(b) Except as otherwise noted in the Schedules, all Intellectual Property Rights are owned by Seller as sole and beneficial owner without restriction (including without limitation charges, mortgages or licenses), or Seller is otherwise authorized to use the same, and all such Contracts and authorizations are valid and enforceable as of the date of this Agreement, and any limitations on ownership or the right to use the Intellectual Property Rights set forth in such Contracts do not materially interfere with Seller's ownership or use of, and will not materially interfere with Purchaser's intended ownership or use of the Intellectual Property Rights.

(c) To the best of Seller's Knowledge, except as set forth in Schedule 3.7, the conduct of the Business does not infringe any Intellectual Property Rights of any other Person, as defined herein.  Except as otherwise noted in the Schedules, no litigation is pending or, to the best of Seller's knowledge, has been threatened against Seller, or any

officer, director, shareholder, employee or agent of Seller, for the infringement of any Intellectual Property Rights of any other party or for the misuse or misappropriation of any trade secret, know-how or other proprietary right owned by any other party, nor does any basis exist for any such litigation or claim. Except as otherwise noted in the Schedules, to the best of Seller's knowledge, there has been no infringement or unauthorized use by any other Person of any Intellectual Property Right belonging to Seller.

SECTION 3.8. <u>Compliance with Laws</u>. The Business is conducted in compliance with all laws.

SECTION 3.9. <u>Compliance with Regulatory and Environmental Rules and Regulations</u>. The Business is conducted in compliance with all regulatory and environmental rules and regulations. To the extent they exist, all regulatory compliance documents related to the Business' products and raw materials, including certificates of analysis, certificates of export, registrations in all foreign countries, clearances, product labels, Material Safety Data Sheets, and related items are reflected in <u>Schedule 3.9</u>.

SECTION 3.10. <u>Environmental Liabilities</u>. To Seller's best knowledge, except as indicated in <u>Schedule 3.10</u>, it has no existing or potential Environmental Liabilities arising out of or related to the Business and its operation. In addition:

(a)     Seller has operated the Business in compliance in all material respects with applicable Environmental Laws;

(b)     Seller is not currently subject to any pending or threatened judicial or administrative investigation, proceeding, order, judgment, decree or settlement with any continuing obligation alleging or relating to a violation of or liability under any Environmental Law, including CERCLA in connection with the operation of the Business;

(c)     To Seller's best knowledge, since the time it began occupying its leased property in 2000, there have been no releases by Seller of Hazardous Substances at or migrating from Seller's leased property used in the Business or any asbestos, polychlorinated biphenyls, lead paint, or underground storage tanks on any Seller operated or leased property used in the Business;

(d)     To Seller's best knowledge, Purchaser will have to make no material expenditure on or after the Closing Date in order to ensure that the condition as of the Closing Date of the leased property used in the Business complies with Environmental Laws; and

(e)     All permits, licenses and approvals required to be obtained by Seller under any Environmental Laws in connection with the Business, including, but not

limited to those relating to the management of Hazardous Substances, have been duly obtained by Seller, are in compliance and in full force and effect as of the Closing Date.

As used in this agreement,

"Environmental Liabilities" means any and all liability, claim, demand, obligation, cause of action, accusation, allegation, order, violation, damage, loss, cost, expense, injury, judgment, penalty, or fine alleged by any third party (including, without limitation, any private party or governmental entity), arising out of, relating to, or resulting from, directly or indirectly, in whole or in part: (i) the presence, generation, transport, disposal, treatment, storage or Release of Hazardous Substances, (ii) the violation or alleged violation of any Environmental Law, or (iii) any Enforcement or Remedial Action. This liability includes any cost of removing or disposing of any Hazardous Substances, any cost of enforcement, cost of investigation and/or remedial action, and any other cost or expense whatsoever, including, without limitation, reasonable attorneys', accountants', engineers', and consultants' fees and disbursements, interest, and medical expenses.

"Release" includes any and all releasing, spilling, leaking, migrating (from or to), pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing, dumping, and any other means by which any Hazardous Substance or other substance may be introduced into or travel through the environment.

"Hazardous Substances" include: (i) oil or other petroleum products, (ii) "hazardous wastes," as defined by the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §6901 et seq., or similar state or local law, ordinance, regulation or order, (iii) "hazardous substances," as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (CERCLA), 42 U.S.C. §9601 et seq., or similar state or local law, ordinance, regulation or order, (iv) "hazardous materials," as defined by the Hazardous Materials Transportation Act (HMTA), 49 U.S.C. §1802, or similar state or local law, ordinance, regulation or order, (v) radioactive materials subject to the Atomic Energy Act (AEA), 42 U.S.C. §2011 et seq., or similar state or local law, ordinance, regulation or order, and (vi) any other pollutant, contaminant, chemical, or substance whose presence creates or could create a hazard to health or the environment or a violation of any federal, state or local Environmental Law.

"Environmental Law" means any past, present, or future federal, state, or local laws, ordinances, regulations, judgments, and orders and the common law, including the law of strict liability and the law of abnormally dangerous activities, relating to environmental matters, including, without limitation, provisions pertaining to or regulating air pollution, water pollution, noise control, wetlands, watercourses, wildlife, Hazardous Substances, or any other activities or conditions which impact or relate to the environment or nature.

"Enforcement or Remedial Actions" include any step taken by any person or entity (i) to cleanup, remedy, or remove any Release of Hazardous Substances, or (ii) to enforce compliance with or to collect or impose penalties, fines, or other sanctions provided by any Environmental Law.

SECTION 3.11.  Tax Returns and Audits.  Within the times and in the manner prescribed by law, Seller has filed all federal, state, and local income, sales, payroll or other tax returns required by law with respect to the Business and has paid all such taxes, assessments, and penalties due and payable.  There is no pending income tax audit and there are no present disputes as to taxes of any nature payable by Seller.

SECTION 3.12.  Employee Relations.  There is currently no labor strike or work slowdown, stoppage or other labor dispute pending or threatened against Seller, nor is there any collective bargaining agreement currently being negotiated by Seller.

SECTION 3.13.  Employee Benefit Plans.  With respect to the Seller's employees (including, without limitation, active employees on vacation, jury duty, bereavement leave, family or adoption leave, short term disability leave, statutory leave or any other absence of eight weeks or less) ("Employees"):

(a)     Seller maintains, administers or contributes to a defined benefit/retirement plan (the "Retirement Plan") which is an Excluded Asset hereunder;

(b)     Seller has not incurred any liability to the Pension Benefit Guaranty Corporation ("PBGC") as a result of the voluntary or involuntary termination of any pension plan subject to Title IV of ERISA; there is currently no active filing by Seller with PBGC (and no proceeding has been commenced by the PBGC) to terminate any pension plan subject to Title IV of ERISA maintained or funded, in whole or in part, by Seller; Seller has not made a complete or partial withdrawal from a multi employer plan, as such term is defined in Section 3(37) of ERISA, resulting in withdrawal liability, as such term is defined in Section 4201 of ERISA (without regard to subsequent reduction or waiver of such liability under either Section 4207 or 4208 of ERISA); and no "prohibited transaction" (within the meaning of Section 406 of ERISA or Section 4975 of the Code) has occurred with respect to any Plan;

(c)     Schedule 12.1 contains a list of all Employees as of August 14, 2008 and said list correctly reflects their base salaries, target bonus percentages, dates of employment and positions;

(d)     Except in accordance with Section 4980B of the Internal Revenue Code of 1986 (the "Code") or as set forth on Schedule 3.13(d), neither Seller nor any

member of Seller's "Controlled Group" (within the meaning of Sections 414(b), (c), (m) or (o) of the Code) has an obligation to provide medical, health, life insurance or other welfare benefits for current or future retired or terminated Employees, their spouses or their dependents; and

   (e) Except as set forth in Schedule 3.13(e), no Plan exists that could result in the payment to any active or former employee of the Business of any money or other property or accelerate or provide any other rights or benefits to any active or former employee of the Business as a result of the transaction contemplated by this Agreement, whether or not such payments would constitute a parachute payment within the meaning of Section 280G of the Code or a severance payment.

  SECTION 3.14. Brokers and Finders. Seller has not incurred any obligation or liability to any party for any broker fees, agent's commissions, or finder's fees in connection with the transactions contemplated hereby for which Purchaser would be responsible.

  SECTION 3.15. Assets Used in the Business. Except for the Excluded Assets, the Purchased Assets include all assets, interest in properties and rights (personal and mixed, tangible and intangible) used (or, in the case of Inventories and tangible personal property, held for use) by Seller to operate the Business.

  SECTION 3.16. Undisclosed Liabilities. Seller has no liability or obligation of any nature, whether primary or secondary, direct or indirect, or absolute, accrued, contingent or otherwise, arising out of or relating to the Business, at any time on or prior to the Closing Date, except for (a) liabilities or obligations reflected or reserved against in Financial Statements dated as of July 31, 2008; (b) liabilities or obligations which have arisen after the date of the July 31, 2008 Financial Statements in the ordinary course of business (other than those that result from or arise out of or which are in the nature of any breach of contract, breach of warranty, tort, infringement, or violation of law); (c) items disclosed in the Schedules, and any Items which would be required to be disclosed on the Schedules for the representations and warranties in this Article 3 to be true and correct but for the limitations set forth in such representations and warranties.

  SECTION 3.17. Material Contracts. Each Contract is in full force and effect and is valid, binding and enforceable in accordance with its terms, except as enforcement may be limited by applicable equitable principles or by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights, and by the exercise of judicial discretion in accordance with general equitable principles. No event has occurred under any Contract that is or, after the giving of notice or the passage of time, would constitute a material default under or a material breach of any such Contract by Seller.

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

SECTION 4.1.  Incorporation, Authority and Binding Obligation.  Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware, and has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  This Agreement  has been or will be duly executed and delivered by Purchaser, and (assuming due authorization, execution and delivery by each other party thereto) this Agreement  constitutes legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their terms, except in the event of Purchaser's bankruptcy, receivership, insolvency, or assignment for the benefit of creditors.

SECTION 4.2.  No Conflict.  The execution, delivery and performance of this Agreement by Purchaser do not and will not:  (a) violate or conflict with the certificate of incorporation or by-laws of Purchaser; (b) conflict with or violate any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award applicable to Purchaser; or (c) result in any breach of, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a breach or default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any indenture, contract, agreement, lease, license, permit, franchise or other instrument relating to any material assets or properties to which Purchaser is a party or by which any of their respective material assets or properties is bound or affected.

SECTION 4.3.  Consents and Approvals.  Prior to the Closing, Purchaser shall obtain all necessary consents, approvals authorizations or other actions by and make all necessary filings or notifications to any governmental or regulatory authority with respect to the purchase of the Business and the Purchased Assets, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or delay Purchaser from performing any of its material obligations under this Agreement or prevent or delay the Closing.

SECTION 4.4.  No Brokers.  No broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Purchaser or its Affiliates.

SECTION 4.5 No Knowledge of Misrepresentations or Omissions.  Purchaser does not have any knowledge that the representations and warranties of the Seller in this Agreement and the Exhibits hereto are not true and correct in all material respects.

# ARTICLE 5
## ADDITIONAL COVENANTS

SECTION 5.1.  Conduct of Business Assets Prior to the Closing.  Seller covenants and agrees that, between July 31, 2008 and the Closing Date, it has and it will:

      (a)      not sell, transfer, assign, convey, license, or otherwise dispose of any of the Purchased Assets other than inventory sold in the ordinary course of conducting the Business prior to the Closing; and

      (b)      continue to conduct the Business in the ordinary course and consistent with its past practice (taking into account the sale of Purchased Assets contemplated hereby), except for actions expressly permitted by this Agreement, matters incident to carrying out this Agreement, and such further matters as may be consented to by Purchaser in advance in writing, which consent shall not be unreasonably withheld or delayed.  Attached as Schedule 5.1(b) is a list of Seller's payables arising out of the operation of the Business including accounts payable, notes payable, other sundry payables and all amounts owing suppliers and other vendors related to the operation of the Business ("Seller's Payables"), with the balance due as of August 12, 2008.  Seller agrees to provide Purchaser with monthly updates regarding the status of Seller's Payables for 90 days after the Closing Date or until Seller's Payables are paid in full.

      (c)      ensure that all Intellectual Property Rights, whether granted, pending, or in application form, are maintained and all fees are paid and any necessary actions related to such Intellectual Property Rights are performed.

SECTION 5.2.  Books and Records.  If, in order to properly prepare documents required to be filed with governmental authorities (including taxing authorities) or its financial statements, it is necessary that either party hereto or any successors be furnished with additional information relating to the Purchased Assets, and such information is in the possession of the other party hereto, such party agrees to use its reasonable efforts to furnish such information to such other party, at the cost and expense of the party being furnished such information.

SECTION 5.3.  Confidentiality.  All methodologies, inventions, software, technology, know-how, product designs, raw material or product specifications and drawings, detail of works and process instructions, lists of suppliers of raw materials and any and all other confidential and/or proprietary information, relating to the Purchased Assets and/or the Intellectual Property Rights are hereinafter referred to as "Confidential Information."  Confidential Information also includes all such information related to any discontinued products.  Each party hereto agrees that all Confidential Information will be held in confidence and will not be used or disclosed except for purposes relating to this Agreement.  No employee of either Seller of Purchaser will be given access to

16

Confidential Information except on a "need to know" basis and such employees shall be informed of the need to keep such Confidential Information confidential.  It is agreed that Confidential Information will not include information that:  (i) is or becomes generally known to the public through no breach of this Section 5.3 or any act or omission on the part of either party; or (ii) is disclosed to either party by a third party having the legal right to disclose such information with no obligation of confidence to either Seller or Purchaser.

SECTION 5.4.  Risk of Loss.  Risk of loss for each of the Purchased Assets shall be borne by Seller until the Closing Date, or until delivery of the Inventory as contemplated by Section 2.6, after which such time Purchaser shall bear the risk of loss for each such Purchased Asset.

SECTION 5.5.  Procurement of Insurance Coverage.  Prior to the Closing, Seller will procure at its sole cost and expense an insurance policy that will provide coverage for the obligations assumed by Seller under this Agreement, including its indemnification provisions.  Said policy will include Commercial General Liability coverage (including products/completed operations coverage) in an amount not less than three million dollars ($3,000,000) per occurrence for personal injury, death or property damage, and five million dollars ($5,000,000) in the aggregate.  Said insurance policy will provide coverage for the obligations assumed by Seller under this Agreement, including its indemnification provisions.  The insurance will be carried with a company or companies of good repute and sound financial condition, and will name Purchaser as an additional named insured.  Certificates of such insurance will be furnished to Purchaser prior to the Closing.  Except with respect to the products/completed operations coverage, such insurance will be maintained by Seller on an occurrence basis for three years after the Closing Date and will not be cancelable, unless thirty (30) days prior written notice is furnished to Purchaser and new provisions for alternate coverage are in place prior to any cancellation.  With respect to the products/completed operations coverage, it will be maintained on a claims made basis for a period of six years after the Closing Date and will not be cancelable, unless thirty (30) days prior written notice is furnished to Purchaser and new provisions for alternate coverage are in place prior to any cancellation.  Purchaser shall reimburse Seller for years four through six of the products/completed operations insurance coverage.

SECTION 5.6.  Access to Properties and Records.  Until the Closing, Purchaser and its counsel, accountants and other representatives will be given reasonable access, upon reasonable notice during normal business hours to all of the properties, personnel, books, tax returns, contracts, commitments and records of Seller as relate to the Purchased Assets.

SECTION 5.7.  Update Schedules.  Seller shall disclose to Purchaser any information requiring amendment of any Schedules to this Agreement prior to the Closing Date in order to ensure that the Schedules are accurate and complete as of the Closing Date in all material respects.

SECTION 5.8.  Communications.  Seller shall cooperate with and provide reasonable assistance to Purchaser in communicating with vendors, dealers and customers regarding the Transfer of the Business with the object of minimizing disruptions to the continued operation of the Business.  Each party shall approve the communications in advance, which approval will not be unreasonably withheld.  The terms of this Agreement shall not be disclosed and shall be kept confidential, except for disclosures required by Law and except for such disclosures as are needed to directors, officers, employees and agents in order to carry out each party's obligations hereunder.

SECTION 5.9.  Employees and Compensation.  Prior to the Closing, Seller will not grant any increase in salaries or benefits payable or to become payable by it, that have not already been are not already identified to Seller to any employee, or enter into any express or implied employment agreement with any employee that is not terminable at will.

SECTION 5.10.  Tax Clearances.  Seller agrees to furnish to Purchaser evidence of payment of all unemployment and worker's compensation insurance contributions, disability insurance contributions, employer payroll taxes and employee withholding taxes and any related certificates that Purchaser may reasonably request as evidence that all such employment contributions and tax liabilities of Seller accruing before the Closing have been fully satisfied or adequately provided for.  Such evidence is set forth in Schedule 5.10.

SECTION 5.11.  Sales and Use Tax Clearances.  Seller further agrees to furnish to Purchaser evidence of payment of all sales and use tax liabilities and any related documentation that Purchaser may reasonably request as evidence that all sales and use tax liabilities of Seller accruing before the Closing Date have been fully satisfied or provided for.  Such evidence is set forth in Schedule 5.11.

SECTION 5.12.  No Solicitation.  Seller will not solicit, directly or indirectly, or engage in any discussions concerning, or cause any other person to solicit or engage in any discussions concerning, any offer to acquire all or any portion of the Business or the Purchased Assets.  Seller will notify Purchaser in the event that Seller receives any expressions of interest in the Business or the Purchased Assets.

SECTION 5.13.  Post-Closing Cooperation.  Seller shall cooperate with Purchaser following the Closing, including executing such documents, applications for transfer and instruments as may be reasonably required to accomplish the transactions contemplated by this Agreement, including the transfer of title to the Purchased Assets.

SECTION 5.14.  Indemnity Account.  Seller shall deposit the sum of Five Hundred Thousand U.S. Dollars ($500,000) into an account to be opened prior to the Closing (the "Indemnity Account") in case funds are necessary to satisfy Seller's indemnity obligations to Purchaser as set forth in Article 8.  The Indemnity Account will

be fully funded on the Closing Date from the proceeds of this transaction and will remain fully funded for three (3) years from the Closing Date.  Seller shall provide Purchaser with quarterly statements showing the account balance of the Indemnity Account. Purchaser shall be named as a co-signor on the account, and no funds may be withdrawn from the Indemnity Account without authorized signatures of both Seller and Purchaser, which authorization shall not be unreasonably withheld.   At the end of the three year period, Seller shall be entitled to withdraw all funds in the Indemnity Account, less the amount of all then-pending indemnification claims by Purchaser or any Purchaser Indemnitee under Article 8.

## ARTICLE 6
## TRANSACTION TAXES

SECTION 6.1  Sales and Use Taxes.   Seller will be responsible for the payment of any and all Income Taxes (including capital gains tax) that may be incurred by Seller in connection with the sale of the Business or Purchased Assets.  Purchaser and Seller will each be responsible for the payment of any and all Transaction Taxes that may be applicable to each party.  Each of Purchaser and Seller agree to cooperate in minimizing the amount of any such taxes, determining the amount of such taxes that may be payable (if any) and in the filing of all necessary documentation and all Tax returns, reports and forms ("Returns") with respect to all such taxes, including any available pre-Closing filing procedures.

## ARTICLE 7
## CLOSING

SECTION 7.1.  Conditions to Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement will be subject to the fulfillment (or written waiver by Seller), at or prior to the Closing, of each of the following conditions:

(a)      Accuracy of Representations and Warranties.  The representations and warranties of Purchaser contained in Article 4 of this Agreement will be true and correct in all material respects at and as of the Closing (other than such representations and warranties as are expressly made as of another date, which shall be true and correct in all material respects at and as of that date);

(b)      Compliance with Covenants.  All the covenants contained in this Agreement to be complied with by Purchaser through the Closing will have been complied with in all material respects;

(c)      No Adverse Order.  No federal, state or other governmental authority or other agency or commission or federal or state or other court of competent jurisdiction will have enacted, issued, promulgated, enforced or entered any statute, rule,

regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions; *provided*, *however*, that the parties hereto will use their reasonable best efforts to have any such order or injunction vacated on or before the Termination Date (as defined in Article 9 hereof);

(d)     No Litigation.  No suit, claim, cause of action, arbitration, investigation or other proceeding contesting, challenging or seeking to alter or enjoin or adversely affect the sale and purchase of the Purchased Assets or any other transaction contemplated hereby will be pending or threatened;

SECTION 7.2.  Conditions to Obligations of Purchaser.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement will be subject to the fulfillment (or written waiver by Purchaser), at or prior to the Closing, of each of the following conditions:

(a)     Accuracy of Representations and Warranties.  The representations and warranties of Seller contained in Article 3 of this Agreement will be true and correct in all material respects at and as of the Closing (other than such representations and warranties that are expressly made as of another date);

(b)     Compliance with Covenants.  All the covenants contained in this Agreement to be complied with by Seller through the Closing will have been complied with in all material respects;

(c)     Delivery of Purchased Assets.  Seller will have delivered, and Purchaser will have received, the Purchased Assets on or before the Closing Date at such locations as are provided for in this Agreement or as the parties may otherwise agree;

(d)     No Adverse Order.  No federal, state, foreign, or other governmental authority or other agency or commission or court of competent jurisdiction will have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) which is in effect and has the effect of making any of the transactions contemplated by this Agreement illegal or otherwise restraining or prohibiting consummation of such transactions; *provided*, *however*, that the parties hereto will use their reasonable best efforts to have any such order or injunction vacated on or before the Termination Date (as defined in Article 9 hereof); and

(e)     No Litigation.  No suit, claim, cause of action, arbitration, investigation or other proceeding contesting, challenging or seeking to enjoin or adversely affect the sale and purchase of the Business or Purchased Assets or any other transaction contemplated hereby will be pending or threatened.

# ARTICLE 8
# INDEMNIFICATION

SECTION 8.1.  Survival of Representations and Warranties.

(a)     The representations and warranties of Seller set forth herein shall survive the Closing and remain in full force and effect without time limit.

(b)     Unless a specified period is set forth in this Agreement (in which event such specified period will control), all covenants contained in this Agreement will survive the Closing and remain in full force and effect without time limit.

SECTION 8.2.  Agreement of Seller to Indemnify Purchaser.  Subject to the terms and conditions of this Article 8, Seller, hereby agrees to indemnify, defend, and hold harmless Purchaser and its directors, officers, employees, agents and representatives from, against, and in respect of any and all Losses asserted against, relating to, imposed upon, or incurred by Purchaser by reason of, resulting from, based upon or arising out of:

(a)     Seller's breach of any representation or warranty of Seller contained in or made pursuant to this Agreement or the breach by Seller of any covenant or agreement made in or pursuant to this Agreement, or any agreement or instrument delivered pursuant to this Agreement;

(b)     Losses from any and all Liabilities of Seller or the Business, including but not limited to Seller's Payables and Seller's Retirement Plan;

(c)     All contributions, interest or penalties due to the Tennessee Department of Labor and Workforce Development or Tennessee Workers' Compensation Board in respect of Seller's employees and all sales and use tax liabilities of Seller, in each case accruing before the Closing Date with respect to the Business; and

(d)     Losses from any and all third party claims arising out of relating to Seller's conduct of the Business, including Losses related to environmental or other regulatory issues.

"Loss" and "Losses" shall mean any and all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, costs, and expenses, including without limitation, interest, penalties, and reasonable attorneys' and other professional fees and expenses, but excluding any indirect, consequential or punitive damages suffered by Purchaser or Seller, such indirect, consequential or punitive damages including, without limitation, damages for lost profits or lost business opportunities of the indemnified party.

SECTION 8.3. <u>Agreement of Purchaser to Indemnify Seller.</u> Subject to the terms and conditions of this <u>Article 8</u>, the Purchaser hereby agrees to indemnify, defend, and hold harmless Seller and its directors, officers, employees, agents and representatives from, against, for, and in respect of any and all Losses asserted against, relating to, imposed upon, or incurred by Seller by reason of, resulting from, based upon or arising out of:

(a)    Purchaser's breach of any representation or warranty of Purchaser contained in or made pursuant to this Agreement, or the breach by the Purchaser of any covenant or agreement made in or pursuant to this Agreement, or any agreement or instrument delivered pursuant to this Agreement;

(b)    Claims and liabilities asserted by third parties against Seller which arise out of or relate to the ownership or use by Purchaser of the Purchased Assets on or after the Closing Date; and

(c)    The business responsibilities, expenses, costs and liabilities of Purchaser relating to the Purchased Assets including but not limited to Purchaser's payables and warranty obligations on sales made by Purchaser after the Closing Date.

(d)    The Assumed Liabilities set forth in <u>Schedule 2.4</u>.

SECTION 8.4.  <u>Procedures for Indemnification.</u>  As used herein, the term "Indemnitor" means the party against whom indemnity hereunder is sought, and the term "Indemnitee" means the party seeking indemnification hereunder.

(a)    A claim for indemnification hereunder ("Indemnification Claim") shall be made by Indemnitee by delivery of a written declaration to Indemnitor requesting indemnification and specifying the basis on which indemnification is sought and the amount of asserted Losses and, in the case of a Third Party Claim (as defined in <u>Section 8.5</u> hereof), containing such other information as Indemnitee shall have concerning such Third Party Claim.

(b)    If the Indemnification Claim involves a Third Party Claim, the procedures set forth in <u>Section 8.5</u> hereof shall be observed by Indemnitee and Indemnitor.

(c)    If the Indemnification Claim involves a matter other than a Third Party Claim, the Indemnitor shall have thirty (30) business days to object to such Indemnification Claim by delivery of a written notice of such objection to Indemnitee specifying in reasonable detail the basis for such objection.  Failure to timely so object shall constitute acceptance of the Indemnification Claim by the Indemnitor and the Indemnification Claim shall be paid in accordance with <u>Section 8.4(d)</u> hereof.  If an objection is timely interposed by the Indemnitor and the dispute is not resolved within

22

Case 5:20-cv-00251-DEW-MLH   Document 47-3   Filed 07/21/21   Page 23 of 32 PageID #:  255

sixty (60) business days from the date Indemnitee receives such objection, such dispute will be resolved by the dispute resolution procedures set forth in Section 10.12.

(d)     Upon a final determination of the amount of an Indemnification Claim, Indemnitor shall pay the amount of such finally determined Indemnification Claim within ten (10) days of the date such amount is determined.

SECTION 8.5. Defense of Third Party Claims. If any claim is made, or suit or proceeding (including, without limitation, a binding arbitration or an audit by any taxing authority) is instituted against Indemnitee that, if prosecuted successfully, would be a matter for which Indemnitee is entitled to indemnification under this Agreement (a "Third Party Claim"), the obligations and liabilities of the parties hereunder with respect to such "Third Party Claim" shall be subject to the following terms and conditions:

(a)     The Indemnitee shall give the Indemnitor written notice of any such claim promptly after receipt by the Indemnitee of actual notice thereof, and the Indemnitor will undertake the defense thereof by representatives of its own choosing reasonably acceptable to the Indemnitee. If, however, the Indemnitor fails or refuses to undertake the defense of such claim within thirty (30) days after written notice of such claim has been given to the Indemnitor by the Indemnitee, the Indemnitee shall have the right to undertake the defense, compromise and, subject to Section 8.6, settlement of such claim with counsel of its own choosing. In the circumstances described in the preceding sentence, the Indemnitee shall, promptly upon its assumption of the defense of such claim, make an Indemnification Claim as specified in Section 8.4(a).

(b)     The Indemnitee and Indemnitor shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including, without limitation, making available records relating to such claim and furnishing, without expense to the Indemnitor, management employees of the Indemnitee as may be reasonably necessary for the preparation of the defense of any such claim or for testimony as witness in any proceeding relating to such claim.

SECTION 8.6. Settlement of Third Party Claims. No settlement of a Third Party Claim involving the asserted liability of Indemnitor under this Article 8 shall be made without the prior written consent by or on behalf of Indemnitor, which consent shall not be unreasonably withheld or delayed.

## ARTICLE 9
## TERMINATION, AMENDMENT AND WAIVER

SECTION 9.1. Termination. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Purchaser; or

(b)      by either Seller or Purchaser if there will have been instituted, pending or threatened (and not withdrawn) any action or proceeding by any governmental authority or administrative agency before any governmental authority, administrative agency or court of competent jurisdiction, or there will be in effect any judgment, decree or order of any governmental authority, administrative agency or court of competent jurisdiction, in either case, seeking to prohibit or limit Purchaser from exercising all material rights and privileges pertaining to its ownership of the Purchased Assets or the ownership or operation by Purchaser or any of its subsidiaries of all or a material portion of the Purchased Assets, or seeking to compel Purchaser or any of its subsidiaries to dispose of or hold separate all or any material portion of the Purchased Assets.

(c)      by Purchaser, if the conditions set forth in Section 7.2 above have not been complied with or performed in any respect (unless the failure results primarily from Purchaser itself breaching any representation, warranty or covenant contained in this Agreement) and such non-compliance or non-performance is not cured or eliminated (or by its nature cannot be cured or eliminated) by Seller on or before the Closing Date.

(d)      by Seller, if the conditions set forth in Section 7.1 above have not been complied with or performed in any respect (unless the failure results primarily from Seller itself breaching any representation, warranty or covenant contained in this Agreement) and such non-compliance or non-performance is not cured or eliminated (or by its nature cannot be cured or eliminated) by Purchaser on or before the Closing Date.

SECTION 9.2.  Effect of Termination.  In the event of termination in accordance with Section 9.1 hereof, this Agreement will forthwith become void and there will be no liability on the part of any party hereto except as set forth in Section 10.1; _provided, however_, that the confidentiality provisions contained in Section 5.3 shall survive termination for a period of seven (7) years.

SECTION 9.3.  Waiver.  At any time prior to the Closing, any party hereto may: (a) extend the time for the performance of any of the obligations or other acts of the other party hereto; (b) waive any inaccuracies in the representations and warranties of the other party hereto contained herein or in any document delivered pursuant hereto; or (c) waive compliance by the other party hereto with any of the agreements or conditions contained herein.  Any such extension or waiver will be valid if set forth in an instrument in writing and signed by the party to be bound thereby.

## ARTICLE 10
## GENERAL PROVISIONS

SECTION 10.1.  Expenses.  Except as otherwise provided in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the

transactions contemplated hereby will be paid by the party incurring such costs and expenses, whether or not Closing will have occurred.

SECTION 10.2. Notices. All notices, requests, claims, demands and other communications hereunder will be in writing and will be given or made (and will be deemed to have been duly given or made upon receipt) by delivery in person, by courier service, by confirmed telecopy or email, or by registered or certified mail (postage prepaid, return receipt requested) to the parties at the following addresses (or at such other address for a party as will be specified by like notice):

(a)     if to Purchaser:

Steve Smith
John Bean Technologies Corporation
3240 Town Point Dr.  Suite 170
Kennesaw, GA 30144
steve.smith@jbtc.com

(b)     if to Seller:

Steve I. Kortely
1113 Harsh Lane
Castalian Springs, TN 37031
615-452-2107 Ph
615-242-4063 Cell

Walter Stubbs, Esq.
1190 Nashville Pike
Gallatin, TN 37066
615-452-4321 Ph
615-452-0188 Fax
wstubbslaw@aol.com

Henry E. Biggs
1199 Hollis Chapel Road
Portland, TN 37148
615-325-2843 Ph
615-414-9051 Cell
hhjjbiggs@yahoo.com

SECTION 10.3. Headings. The headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.  In the event of a conflict between language or amounts contained in the body of the Agreement and language or amounts contained in the exhibits attached hereto, the language or amounts in the body of the Agreement shall control.

SECTION 10.4. Severability. If any term or other provision of this Agreement is held invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated

hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

SECTION 10.5. Entire Agreement. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersede all prior agreements and undertakings with respect to the subject matter hereof, both written and oral.

SECTION 10.6. Assignment. This Agreement shall not be assigned by either party without the prior written consent of the non-assigning party; provided however that the Purchaser may assign this to a successor-in-interest or affiliated company without Seller's consent. In such case, the Agreement shall inure to the benefit of and be binding upon the Purchaser's assignee.

SECTION 10.7. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or will confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, except for the indemnification rights of Purchaser Indemnitees and Seller Indemnitees under Article 8 hereof.

SECTION 10.8. Amendment; Waiver. This Agreement may not be amended or modified except by an instrument in writing signed by both parties. Waiver of any term or condition of this Agreement will only be effective if in writing and will not be construed as a waiver of any subsequent breach or waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.

SECTION 10.9. Governing Law. This Agreement will be governed by, and construed in accordance with, the laws of the State of Ohio, without regard to the principles of choice of law or conflicts or law of any jurisdiction.

SECTION 10.10. Counterparts. This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed will be deemed to be an original but all of which taken together will constitute one and the same agreement.

SECTION 10.11. Restriction on Disclosure of Agreement Terms. Neither party shall publicly disclose or announce the price being paid for the Purchased Assets hereunder or the detailed terms and conditions of this Agreement (other than to such party's employees, directors or advisors with a need to know such information) without the other party's prior written consent; provided, however, that notwithstanding the

foregoing, a party may make such disclosures regarding this Agreement and the Purchased Assets, as it determines with the advice of its legal counsel, are required under applicable laws and regulations or orders, decrees, inquiries or subpoenas of any court or governmental body, and in that case such party will give the other party prior written notice of its intention to make such disclosure pursuant to this provision.

SECTION 10.12.  Dispute Resolution and Litigation.

(a)    In the event of any dispute or disagreement between Seller and Purchaser as to the interpretation of any provision of this Agreement or the performance of obligations hereunder, the parties shall promptly confer in a good faith effort to resolve the dispute.  Should such good faith effort fail to resolve the dispute within thirty (30) days after such meeting, the parties agree to submit the matter to mediation or to some other mutually agreeable alternative dispute resolution procedure.  If that process fails, or if the parties are unable to reach agreement on the form of alternative dispute resolution procedure, each of the Seller and Purchaser shall be free to pursue and exercise any and all legal rights and remedies available to them.

(b)    Either party may request that any dispute, question or difference arising at any time between either of the parties with regard to any matter arising out of, or with regard to the interpretation of, or the termination of, or any matter arising out of the termination of, or with regard to the rectification of, this Agreement may (after complying with the requirements of Section 10.12(a)), be submitted to, and be decided by way of, arbitration by a single arbitrator held in terms of this clause.  In the event that the parties agree to proceed in arbitration:

(i)    The arbitration will be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and conducted in a location that is mutually agreeable to the parties.

(ii)    Having consented to arbitration, each of the parties will be deemed to have irrevocably agreed to proceed in arbitration and shall not be entitled to withdraw therefrom or to claim at any arbitration or litigation proceeding that it is not bound by the provisions of this clause.

(c)    If the parties do not elect to proceed in arbitration, after the satisfaction of the requirements of Section 10.12(a), either party may elect to pursue its claim in a state or federal court of competent jurisdiction.

(d)    The parties acknowledge and agree that nothing in this Section 10.12 shall preclude either of them from proceeding against the other in any court of competent jurisdiction where relief is being sought on an urgent and interim basis.

SECTION 10.13.  Assistance with Transition Activities.  Seller will provide Purchaser with all reasonable support in Purchaser's efforts to ensure a smooth product and customer transition, including support in initial launch activities whereby the parties announce the integration of Seller's business into Purchaser and assistance with the transfer or assignment of any contracts.

## ARTICLE 11
## NON-COMPETITION AND NON-SOLICITATION

SECTION 11.1. Non-Competition. In consideration of the premises contained herein, and to induce Purchaser to enter into this Agreement and to perform its obligations hereunder, Seller hereby covenants and agrees that for a period commencing on the Closing Date and continuing until the fifth (5th) anniversary of the Closing Date, that neither Seller nor any of its Affiliates will, directly or indirectly, own, manage, operate, join, control or participate in the ownership, management, operation or control of, any business (whether in corporate, proprietorship or partnership form or otherwise), or invest, directly or indirectly, in any such business, where such business is, directly or indirectly, engaged in the protein slicing industry, including poultry, pork, red meats, fish and other proteins, or the bread slicing industry, including frozen bread, biscuits, and other bakery products. Likewise, Messrs. Biggs and Kortely agree that they will enter into individual non-compete agreements in the form attached hereto as Exhibits B and C.

SECTION 11.2. Reasonableness of Restrictions. Seller and Purchaser acknowledge and agree that the foregoing restrictive covenants are necessary to preserve the value of the Purchased Assets and the other rights purchased under this Agreement and to preserve the Business. As such, Seller acknowledges and agrees that the foregoing restrictive covenants are reasonable notwithstanding the expense or hardship that they may impose on Seller or any of its Affiliates. Seller agrees that each has received fair and adequate consideration for entering into these covenants and further agrees that if any of the provisions of these covenants are or become unenforceable, the remainder of these covenants will nevertheless remain binding to the fullest extent possible, taking into consideration the purposes and spirit hereof. It is the desire and intent of the parties to this Agreement that the provisions of this Article 11 shall be enforced to the fullest extent permissible under Law and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Article 11 shall be adjudicated to be invalid or unenforceable, such provision shall be deemed amended to delete or modify (including to limit or reduce its duration, geographical scope, activity or subject) the portion adjudicated to be invalid or unenforceable, such deletion or modification to apply only with respect to the operation of such provision of this Article 11 in the particular jurisdiction in which such adjudication is made and to be made only to the extent necessary to cause the provision as amended to be valid and enforceable.

SECTION 11.3. Irreparable Harm; Injunctive Relief. Each party acknowledges and understands that the provisions of this Article 11 are of a special and unique nature, the loss of which cannot be accurately compensated for in damages by an action at law and that the breach or threatened breach of the provisions of this Article 11 may cause Purchaser irreparable harm. In the event of a breach or threatened breach by Seller or any of its Affiliates of the provisions of this Article 11, Purchaser shall be entitled to seek an injunction restraining it from such breach or threatened breach (without the requirement of posting a bond or other security therefore). Nothing herein contained shall be construed as prohibiting Purchaser from pursuing any other remedies available for any

breach or threatened breach of this Article 11 by Seller, and the pursuit of an injunction or any other remedy shall not be deemed to be an exclusive election of such a remedy.

**ARTICLE 12**
**EMPLOYEES**

SECTION 12.1.  List of Employees.  Schedule 12.1 contains a list of all Employees as of August 14, 2008 and said list correctly reflects their base salaries, target bonus percentages, dates of employment and positions.  Seller represents and warrants that it shall remain responsible for any and all Liabilities relating to its Employees, and that Purchaser does not accept any Liabilities relating to any Employees, regardless of whether Seller chooses to hire any of those employees or not.

SECTION 12.2.  Biggs Agrees to Become an Employee of Purchaser.  Seller understands that Purchaser intends to hire Henry Biggs and that it is a condition of this transaction that Mr. Biggs will accept employment with Purchaser.  Prior to the Closing Date, Purchaser shall offer employment to Mr. Biggs on terms and conditions to be agreed between the parties.  Seller shall remain liable for any severance or other employment-related obligations, if any, due and owing to Mr. Biggs.

SECTION 12.3.  Kortely Agrees to Work As a Consultant for Purchaser.  Seller understands that Purchaser intends to retain Steve Kortely as a consultant for up to 1000 hours in the six months following the Closing Date, and, if needed, for an additional period, and that it is a condition of this transaction that Mr. Kortely agree to work as a consultant for Purchaser.  Purchaser and Mr. Kortely have agreed to execute a consulting agreement, which will set forth Mr. Kortely's hourly consulting rate.  Seller shall remain liable for any severance or other employment-related obligations, if any, due and owing to Mr. Kortely.

SECTION 12.4.  Purchaser to Offer Employment to Certain of Seller's Employees.  In addition, Purchaser intends to offer employment on an at-will basis to a number of Seller's current Employees, provided such employees successfully complete Purchaser's background check, drug screening, and physical examination tests.  Seller intends to terminate its employees immediately prior to the Closing and to satisfy all outstanding pension, vacation pay, and other obligations upon such termination.  Seller shall remain liable for any severance or other employment-related obligations, if any, due and owing to those Employees or to the Employees to whom Purchaser does not offer employment.  Purchaser does not assume any employee-related liabilities in this transaction.

## ARTICLE 13
## <u>AGENTS</u>

Purchaser has no responsibility or liability whatsoever for any agents or distributors it does not accommodate in its new marketing structures, including Batchmaster.   Any such liabilities will be borne by Seller.

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed as of the date first written above by their respective duly authorized representatives.

"PURCHASER"                              "SELLER"

JOHN BEAN TECHNOLOGIES CORPORATION        USA SALES & AUTOMATION LLC

By: _____KBJ_____                    By: _Henry E. Biggs MEMBER_

Name: _Kenneth B. Jones_                  Name: _HENRY E. BIGGS_

Title: _Director Corporate_               Title: _Steve Kortely, Member_
       _Development_
                                          By: _Steve Kortely, Attorney in fact_
                                          STEVE KORTELY
                                          by WALTER H. STUBBS
                                          Attorney in Fact

32